UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

INNERCITY RECYCLING :
SERVICE LLC, et al. :
 :
    v. : C.A. No. 13-648ML
 :
SMM NEW ENGLAND :
CORPORATION :

**REPORT AND RECOMMENDATION**

Lincoln D. Almond, United States Magistrate Judge

    Pending before me for a report and recommendation (28 U.S.C. § 636(b)(1)(B)) is Defendant SMM New England Corporation's Motion for Partial Judgment on the Pleadings pursuant to Fed. R. Civ. P. 12(c). (Document No. 59). Plaintiffs oppose the Motion. (Document No. 65). A hearing was held on April 16, 2014. For the following reasons, I recommend that Defendant's Motion be GRANTED in part and DENIED in part as set forth herein.

    **Background**

    The following facts are gleaned from Plaintiffs' Second Amended Class Action Complaint (Document No. 29), and, if well-pled, must be accepted as true by the Court in considering Defendant's Rule 12(c) Motion. Plaintiffs are a group of scrap metal recyclers who "sell to, could sell to or in the future will sell to SMM and who have been or in the future will be subjected to unlawful reductions to their loads by way of manual weights, adjustments for non-conforming materials, deductions and/or re-allocation, false identification or rejection of non-ferrous materials." (Document No. 29 at ¶ 13). Defendant SMM operates two metal recycling facilities in Rhode Island and a metal recycling facility in North Haven, Connecticut. Plaintiff Kenneth Serapiglia is the President of Innercity. Id. at ¶ 6. Anthony Izzo is the current President of SMM. Id. at ¶ 20. Serapiglia and Izzo have a personal relationship that dates back to childhood. Id.

In or about March 2011, Serapiglia operated Cove Metal, a metal recycling business. Cove Metal did business with Schnitzer Steel, which was also in the metal recycling business. Id. at ¶ 21. Izzo was the President of Schnitzer Steel before he left to become President of SMM. Id. Serapiglia left Cove Metal by the end of March 2011. Id. The day after he left Cove Metal, Serapiglia was contacted by Izzo, who stated that SMM would provide him funding to start a new metal recycling business if Serapiglia would agree to an exclusive supplier contract with SMM. Id. at ¶ 22.

Serapiglia incorporated Innercity on April 26, 2012 and Innercity began operating on or about August 23, 2012. Id. at ¶¶ 24, 25. In September 2012, Serapiglia met with Izzo at the SMM offices. Izzo provided Serapiglia with a contract to review regarding the money that SMM was loaning to Innercity and Innercity's reciprocal exclusive supplier agreement to SMM. Id. at ¶ 26. Serapiglia had an attorney review the contract, which he then signed and returned to William Huling, Director of Operations at SMM. Id. at ¶¶ 27, 28. Serapiglia did not receive a copy of the executed contract. Id. at ¶ 28.

The total amount of the "start up" loan from SMM to Innercity was $150,000.00. The funds were distributed to Innercity in five different disbursements from August through December 2012. Id. at ¶ 33. Each time Serapiglia received a disbursement, he signed a term promissory note or a revolving promissory note as to each amount. Id.

In October 2012, Huling called Serapiglia to advise him that he needed to sign a new contract in light of the fact that SMM had loaned Innercity additional monies after the first contract was signed. Id. at ¶ 29. On October 5, 2012, Serapiglia went to SMM and met with Huling and Izzo. Huling presented Serapiglia with a contract with "sign here" stickers. Huling never told Serapiglia that the new contract contained any provisions which differed from the first contract, nor did he suggest Serapiglia read it, or give him an opportunity to read it. Id. at ¶ 30. The contract contains several provisions different than the original contact. Id. at ¶ 31. Huling subsequently informed Serapiglia that he needed to sign an agreement regarding a revolving line of credit for money SMM had or would provide to Innercity. Id. at ¶ 32.

Plaintiffs believed that in selling scrap metal materials to SMM, SMM would utilize its automated scales to obtain gross weights of the trucks loaded with scrap metal (the "gross weight") and then use their scales to obtain the weight of the truck after the scrap metal was dumped at SMM (the "tare weight"). SMM would then pay to Plaintiffs the difference between those two weights (the "net weight") multiplied by an agreed upon value per pound or ton of the load. Id. at ¶ 35.

In selling SMM non-ferrous scrap, Innercity would place each type of non-ferrous scrap in individual cardboard boxes known as gaylords. Innercity would weigh the gaylords and record their weight and the agreed upon price for the particular metal on a document prior to leaving the Innercity facility. Id. at ¶ 36. Innercity provided the document to the SMM driver who picked up the load of gaylords. Id. SMM also weighed the gaylords and then paid Innercity based on the weight multiplied by the agreed upon value per pound. Id. SMM would deduct from the weight any portion of the load that was non-conforming material, i.e., dirt, mud, tires, wood, etc. Id. at ¶ 37. Innercity claims that SMM represented that any deduction for non-conforming materials would be according to its "standardized procedures." Id. Innercity understood that the custom in the industry is to document by photograph or otherwise, any such non-conforming material including its approximate weight. Id.

In June 2013, Innercity employees reviewed its internal books and records and discovered a discrepancy between the amount of scrap metal it had purchased from its customers and the amount it had sold to SMM according to SMM's payments. Id. at ¶ 38. Innercity believed that the discrepancy totaled 95,000 pounds, and Innercity's accountants calculated the dollar amount of the discrepancy to be $117,000.00. Id. Innercity requested that SMM explain this discrepancy and was not satisfied with the explanation given by SMM. Id. at ¶ 39.

Subsequently, Innercity learned that SMM utilized a computer system provided by Systems Alternatives International ("SAI"), and Innercity sought to gain access to the records of its deliveries to SMM "and other related information." Id. at ¶ 40. Innercity gained access to its records in August 2013. Id. at ¶

41. Innercity claims that it then became aware of "SMM's practice of changing or otherwise adjusting the weights of the loads it purchased from Innercity." Innercity asserts that SMM "recorded 'manual' weights to the gross and/or the tare of the loads without recording the actual weight(s) reflected on the scale(s); reducing either the gross or net weight of a load; increasing the tare weight of a load; recording adjustments for alleged non-conforming materials and/or re-allocating, falsely identifying or rejecting the type of materials within the loads. SMM's practice...resulted in reducing the amount of Innercity's load(s) for which SMM paid Innercity." Id. Innercity requested that SMM explain the manual weights, adjustments, deductions and rejection of materials and was told that changes were made to the tare weights to account for changes in the weight of the delivery truck due to the driver filling the truck with gas en route. Id. at ¶ 42. SMM also told Innercity that mechanical problems sometimes resulted in the necessity to record manual weights. Id. at ¶ 43.

Subsequently, in July 2013, Innercity began to record the weights of its loads prior to leaving their facility. When SMM paid Innercity less than the weight Innercity had recorded, Innercity contacted SMM for an explanation and was again unsatisfied with its response. Id. at ¶ 44. Innercity claims that a subsequent review of the SAI records revealed that SMM began making adjustments to the loads for "'mud/dirt,' 'wood,' 'garbage,' 'rubber tires' or other non-conforming materials that it claimed were included in the loads of scrap metal received by SMM beginning in June 2013." Id. at ¶ 45. The adjustments resulted in a reduction of the weight upon which Innercity was paid. Id. Innercity claims it never received an adjustment for non-conforming materials prior to this date. Id. Innercity further alleges that the SAI records were subsequently deleted "by or at the direction of SMM." Id. at ¶ 46. SMM then referred Innercity to its "guidelines" on non-conforming materials, a copy of which neither Innercity nor Serapiglia had ever received. Id.

Innercity claims that SMM would "re-allocate, falsely identify or reject" certain material or place it with lower-priced materials to maintain the weight, but lower the cost paid to Innercity. Id. at ¶ 47. Innercity subsequently learned that SMM had changed the identifying ticket numbers of certain loads sold to SMM.

This caused Innercity to be unable to track its loads. Id. at ¶ 49. Plaintiffs also allege that beginning in March 2012 and continuing through August 2013, Plaintiffs K&R Auto and Tiverton Auto were selling ferrous and non-ferrous scrap metal to SMM in the form of automobiles and car parts. Id. at ¶¶ 80, 81. From about January 2012 through September 2013, Plaintiff Charles Scrap was selling ferrous and nonferrous scrap metal to SMM. Id. at ¶ 82. In or about August 2012, Innercity began buying ferrous and non-ferrous scrap and selling it to SMM. Innercity's method of delivering the materials to SMM varied. Sometimes, the scrap was delivered to SMM by a third party. Other times, Innercity loaded the scrap into gaylords for pickup, and SMM sent its trucks, or those of a third-party, to pick up and transport the gaylords to SMM's locations. Id. at ¶ 83.

SMM's Allens Avenue facility has an "incoming" scale that obtains the gross weight and a separate "outgoing" scale that obtains the tare weight. Id. at ¶ 84. The scales use automated computer software to input information into the SAI system. Id. Plaintiffs allege that rather than paying them the net weight of the load, SMM would record manual weights of the loads in order to decrease the gross weight or increase the tare weight. Id. at ¶ 86. This would result in a reduction of the net weight and reduced payment to Plaintiffs. SMM failed to provide Plaintiffs with a satisfactory reason for the manual weights. Id. at ¶ 87. SMM also made further adjustments to the gross weight by deducting an amount for non-conforming material such as dirt, mud, wood, rubber tires or garbage. Id. at ¶ 88. Many of these deductions were "unlawful" according to Plaintiffs since the price per ton of crushed cars took into account that non-conforming materials such as plastic, glass and tires would be included. Id. Plaintiffs allege that the industry standard is to provide photographic proof of non-conforming materials, but that SMM never conformed to this practice. Id. at ¶ 89. Plaintiffs also allege that SMM made additional deductions without providing any basis, and these additional deductions were identical in weight to the deductions for non-conforming materials. Id. at ¶ 90. Plaintiffs also claim SMM re-allocated, falsely identified or rejected certain material in order to reduce the value of the load. Id. at ¶ 91. Finally, Plaintiffs allege that Izzo and other SMM employees had full authority to delete

and recreate tickets and other identifying information regarding loads in the SAI system. Plaintiffs allege that "on more than one occasion" Izzo "knowingly caused SMM to pay a supplier for the full weight of a load which included non-conforming materials in order to keep that supplier's business." Id. at ¶ 92. SMM brings the present Motion to challenge the legal viability of the Federal and Rhode Island RICO claims (Counts IX and X) and the fraud-based claims (Counts I, II and VIII) brought by Plaintiffs.

**Standard of Review**

Defendant moves for partial judgment on the pleadings under Fed. R. Civ. P. 12(c). A motion under Rule 12(c) will "ordinarily warrant the same treatment" as a motion to dismiss for failure to state a claim under Rule 12(b)(6). Collier v. City of Chicopee, 158 F.3d 601, 602 (1st Cir. 1998); Frappier v. Countrywide Home Loans, Inc., 750 F.3d 91, 96 (1st Cir. 2014) (noting that "standard of review of a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is the same as that for a motion to dismiss under Rule 12(b)(6)"). Thus, under Rule 12(c), the Court must construe the complaint in the light most favorable to the plaintiff, see Negron-Gaztambide v. Hernandez-Torres, 35 F.3d 25, 27 (1st Cir. 1994); taking all well-pleaded allegations as true and giving the plaintiff the benefit of all reasonable inferences, see Arruda v. Sears, Roebuck & Co., 310 F.3d 13, 18 (1st Cir. 2002); Carreiro v. Rhodes Gill & Co., 68 F.3d 1443, 1446 (1st Cir. 1995). If under any theory the allegations are sufficient to state a cause of action in accordance with the law, the motion to dismiss must be denied. Vartanian v. Monsanto Co., 14 F.3d 697, 700 (1st Cir. 1994).

While a complaint need not contain detailed factual allegations in order to withstand dismissal, a plaintiff's "obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal citation omitted) see also Manning v. Boston Med. Ctr. Corp., 725 F.3d 34, 43 (1st Cir. 2013) ("conclusory allegations that merely parrot the relevant legal standard are disregarded, as they are not entitled to the presumption of truth.").

"The complaint must allege 'a plausible entitlement to relief' in order to survive a motion to dismiss." Thomas v. Rhode Island, 542 F.3d 944, 948 (1st Cir. 2008) (quoting Twombly, 550 U.S. at 559). See also Ashcroft v. Iqbal, 556 U.S. 662, 679 ("[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief"). The Court of Appeals has cautioned that the "plausibility" requirement is not akin to a "standard of likely success on the merits," but instead, "the standard is plausibility assuming the pleaded facts to be true and read in a plaintiff's favor." Sepulveda-Villarini v. Dep't of Educ. of P.R., 628 F.3d 25, 30 (1st Cir. 2010).

Moreover, "[t]he court's assessment of the pleadings is context-specific, requiring the court 'to draw on its judicial experience and common sense.' ...Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but has not shown – that the pleader is entitled to relief." Camilo v. Nieves, Civ. No. 10-2150 (DRD), 2013 WL 6632801, * 6 (D.P.R. Dec. 16, 2013) (quoting Iqbal, 556 U.S. at 680) (internal quotations and alterations omitted).

**Discussion**

**A.    Count I – Fraud in the Factum**

The Court first considers Defendant's argument that the fraud counts asserted by Plaintiffs fail to state viable claims. Count I of Plaintiffs' Second Amended Class Action Complaint encompasses paragraphs 20 through 49 and sets forth a fraud in the factum claim. While the cited paragraphs go well beyond merely setting out the factual predicates of a fraud in the factum claim, Plaintiffs' counsel clarified at oral argument that the fraud in the factum claim is "the contract signing issue." (Document No. 80 at p. 10). Thus, parsing the Second Amended Complaint, this claim is principally directed to Plaintiffs' allegation that SMM's representatives informed Mr. Serapiglia that he "would have to sign a different contract because SMM had loaned additional monies to Innercity after the first contract was signed." (Document No. 29 at ¶ 29). Plaintiffs claim that SMM's representative William Huling "did not inform Serapiglia that this different contract would contain any different terms from the one Serapiglia had previously reviewed and signed other

than the amount of money being loaned." Id. Plaintiffs claim that when Mr. Serapiglia went to sign the contract, there were "sign here" stickers "on two pages" and that neither "Huling [n]or Izzo suggest[ed] Serapiglia read the contract before signing it" nor did SMM "give Serapiglia an opportunity to read the contract before signing it." Id. at ¶ 30. Plaintiffs go on to claim that, "[t]he contract dated October 5, 2012 and signed by Serapiglia contains numerous provisions different from the contract that Serapiglia had reviewed and signed previously." Id. at ¶ 31.

In its Motion, SMM attacks Plaintiffs' failure to specifically identify the contracts which Plaintiffs claim are void due to the alleged fraud. Id. Although it is true that Count I of Plaintiffs' Amended Complaint includes facts that are unrelated to the fraud in the factum claim, the Court is reasonably able to identify the contracts that Plaintiffs allege are the subject of this claim. Rather than suffering from a pleading deficiency, the fraud in the factum count suffers from a legal deficiency. In short, the case law does not support Plaintiffs' interpretation of a fraud in the factum claim.[1]

SMM draws a parallel between this case and the First Circuit opinion in Vasapolli v. Rostoff, 39 F.3d 27, 35 (1st Cir. 1994), arguing that the result reached in Vasapolli supports the dismissal of the fraud in the factum count in this case. In that case, the First Circuit noted that "[f]raud in the factum occurs when a party is tricked into signing an instrument without knowledge of its true nature or contents....Thus, to constitute fraud in the factum a misrepresentation must go to the essential character of the document signed, not merely to its terms....For example, if a person signs a contract, having been led to believe that it is only a receipt, the stage may be set for the emergence of fraud in the factum." In Vasapolli, the Court found that there was no valid claim for fraud in the factum, since the "alleged disparity goes to the transactional terms, not to the very

---

[1] On August 1, 2014, Justice Silverstein of the Rhode Island Superior Court in a related case (SMM v. Innercity and Serapiglia, C.A. No. PB 14-0004) granted summary judgment in favor of SMM on Innercity and Serapiglia's fraud in the factum defense to SMM's claim on the promissory note in issue. Justice Silverstein reasonably concluded that "the defense of fraud in the factum is not available to [Innercity and Serapiglia] when they had a reasonable opportunity to read the Supplier and Loan Agreement before signing it and manifesting their assent" and their "failure to do so does not amount to excusable ignorance as required to make out a defense of fraud in the factum." Decision at pp. 11-12. His reasoned conclusion is consistent with this Court's analysis.

nature of the agreements. Since it is not disputed that the plaintiffs knew the [nature of the notes they were signing], the [Defendant's] conduct, even if unscrupulous, cannot be deemed fraud in the factum." Vasapolli, 39 F.3d at 35 (citations omitted). SMM asserts that the facts recounted by the First Circuit in Vasapolli, are similar to those alleged here, since Plaintiffs appear to be claiming that the terms in the second agreement signed by Serapiglia were not the same as the first agreement. While Vasapolli certainly presents a different factual scenario than the one present here, the basic legal holding in that case does help guide the Court's decision making here.

Fraud in the factum concerns "[m]isrepresentation as to the nature of a writing that a person signs with neither knowledge nor reasonable opportunity to obtain knowledge of its character or essential terms." Black's Law Dictionary 661 (6th ed.1990). See also Rhode Island Depositors Econ. Prot. Corp. v. Duguay, 715 A.2d 1278, 1280 (R.I. 1998) and R.I. Gen. Laws § 6A-3-305(a)(1)(iii).

In their opposition, Plaintiffs set forth several arguments as to why their fraud in the factum count states a viable claim and should survive Defendant's Rule 12(c) challenge which all miss the mark. In short, the situation described by Plaintiffs simply does not fit within the legal definition of "fraud in the factum." Here, Plaintiff Serapiglia was aware of the nature of the agreement he was signing and had a reasonable opportunity to read the agreement before signing it, but claims he was mislead as to the terms of the agreement. Like Vasapolli, this claim is insufficient as a matter of law to state a claim of "fraud in the factum," and I recommend that the District Court GRANT Defendant's Motion as to Count I.

      **B.    Count II – Fraud in the Inducement**

Count II of Plaintiffs' Second Amended Class Action Complaint is for fraud in the inducement, and much like the fraud in the factum claim, is based upon Plaintiffs' allegation that they were misled as to the terms of the subsequently signed agreement. Specifically, Plaintiffs claim that SMM and Izzo made the "alleged representations as to the terms of the contract(s) to induce Innercity to sign the exclusive contract with SMM and to get Serapiglia to sign the personal guarantee." (Document No. 29 at ¶ 51). The Second

Amended Complaint alleges that the "representations regarding the terms of the contract(s) were material...[and that] Innercity and Serapiglia reasonably relied on SMM's and Izzo's representations." Id. at ¶¶ 52, 53. Plaintiffs assert that the representations were false...and "made...in order to guaranty the sale of scrap metal to SMM, to meet the necessary quota for outgoing shipments and to compete with their competition, Schnitzer." Id. at ¶ 54. Plaintiffs also assert that "Defendant had a duty to disclose to Serapiglia that other terms of the agreement had been changed. Serapiglia would not have signed the new agreement had he known Defendant had changed the other terms." (Document No. 65-1 at p. 29).

The Rhode Island Supreme Court has stated that "fraud in the inducement is defined as '[m]isrepresentation as to the terms, quality or other aspects of a contractual relation...that leads a person to agree to enter into the transaction with a false impression or understanding of the risks, duties or obligations she has undertaken.'" Rhode Island Depositors Econ. Prot. Corp. v. Duguay, 715 A.2d 1278, 1280 (R.I. 1998) (citing Bourdon's, Inc. v. Ecin Indus., Inc., 704 A.2d 747, 753 (R.I.1997)). Taking the plain allegations of the Second Amended Complaint as true, Plaintiffs allege that Defendant misled them as to several material terms in the contract, and that they would not have signed it without those misrepresentations. At this stage of the pleadings, the allegations made by Plaintiffs are sufficient to state a claim for fraud in the inducement.[2] The Rhode Island Supreme Court has stated, "[i]f one is induced to enter into a contract based upon a fraudulent statement from the other party to the contract, then the party who has been fraudulently induced is not bound by the contract. And a party may invoke a claim of fraud in the inducement, even if he or she was negligent in failing to read the contract." Bjartmarz v. Pinnacle Real Estate Tax Serv., 771 A.2d 124, 127 (R.I. 2001) (citations omitted). Accordingly, I recommend that the District Court DENY Defendant's Motion as to Count II.

---

[2] In his recent decision in SMM v. Innercity and Serapiglia, C.A. No. PB 14-0004, Justice Silverstein also granted summary judgment in favor of SMM on Innercity and Serapiglia's fraud in the inducement defense. While Justice Silverstein's reasoning is sound and persuasive, this Court is reviewing Plaintiffs' fraud in the inducement claim under Rule 12(c) and not Rule 56 and, applying the more forgiving standard of Rule 12(c), this Court finds that Plaintiffs have sufficiently plead a fraud in the inducement claim and leaves the evidentiary assessment of that claim to another day.

### C. Count VIII – General Fraud

Defendant has also moved that this Court dismiss the general fraud claims against it due to lack of particularity pursuant to Fed. R. Civ. P. 9(b). Plaintiffs' general fraud claims are all based on the alleged practice of Defendant using manual weights, making adjustments to the weights of the loads and otherwise reducing payments to Plaintiffs. (Document No. 29 at ¶¶ 78- 93). "To establish a prima facie case of common law fraud in Rhode Island the plaintiff must prove that the defendant made a false representation intending thereby to induce plaintiff to rely thereon, and that the plaintiff justifiably relied thereon to his or her damage." W. Reserve Life Assurance Co. of Ohio v. Conreal LLC, 715 F. Supp. 2d 270, 282 (D.R.I. 2010) (quoting Zaino v. Zaino, 818 A.2d 630, 638 (R.I. 2003)). In the present case, Plaintiffs' Objection notes that their fraud claim is based on the assertion that "SMM, represented to them...the manner in which it would weigh their loads of scrap metal and pay them." (Document No. 65-1 at p. 30). Plaintiffs assert that they relied upon this representation in entering into business with SMM and that this representation caused them economic damages. With this Count, Plaintiffs are attempting to dress up a breach of contract claim as one sounding in fraud. While their base allegation, taken on its face, may be actionable as a breach of contract, there is nothing in the Second Amended Complaint that sets this factual scenario apart from any another garden variety breach of contract claim. The allegations set forth simply do not meet the pleading standard required to allege a fraud claim. "Even where allegations are based on information and belief, supporting facts on which the belief is founded must be set forth in the complaint. And this holds true 'even when the fraud relates to matters peculiarly within the knowledge of the opposing party.'" Era v. Morton Cmty. Bank, C.A. No. 11-455-M, 2014 WL 1265699 (D.R.I. Mar. 28, 2014) quoting Hayduk v. Lanna, 775 F.2d 441, 444 (1st Cir.1985). In the present case, Plaintiffs' allegations are conclusory, unsupported and thus not in compliance with Rule 9(b)'s "particularity" requirement for pleading claims of fraud.

### D. Counts IX and X – Federal and Rhode Island RICO Claims

Counts IX and X of Plaintiffs' Second Amended Class Action Complaint allege claims under the Rhode Island Racketeering and Corrupt Organizations Act ("RI RICO"), R.I. Gen. Laws § 7-15-1(c)[3] and the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1961(1)(b). Count IX, the RI RICO claim, alleges larceny by false pretenses as the predicate act. Count X, the Federal RICO claim, alleges mail fraud as the predicate act.

### 1. Whether Plaintiffs State Viable Claims Under Subsections (a) and (b) of 18 U.S.C. § 1962

Plaintiffs' RICO claims suffer from a variety of shortcomings. The first issue presented is the parties' disagreement regarding the subsections of 18 U.S.C. §1962 under which Plaintiffs' claims are made. Defendant's Motion focuses solely on Plaintiffs' potential claims under 18 U.S.C. § 1962(c), arguing that to the extent "Plaintiffs' ambiguous and conclusory allegations can be construed to state a violation of any of the four RICO subsections...it would be 1962(c)." (Document No. 59-1 at p. 6). Plaintiffs refuse to concede that their RICO claims are limited to 1962(c), instead noting that they are pursuing their RICO claims under subsections (a), (b) and (c) of §1962, and that their Second Amended Complaint "tracks the language of the statute and sets forth factual allegations to sufficiently apprise the Defendant of the charges against it." While the parties have not addressed the potential claims under subsections (a) or (b) at all, the Court finds that the Second Amended Complaint plainly fails to state any viable claims under those subsections.

In order to state a claim under subsection 1962(a), "the plaintiff must allege an injury resulting from the investment of racketeering income distinct from an injury caused by the predicate acts themselves." George v. Nat'l Water Main Cleaning Co., C.A. No. 10-10289-NMG, 2011 WL 841226 (D. Mass. Mar. 23,

---

[3]Although there are slight differences in the elements required to prove a civil violation under Rhode Island's RICO statute versus the Federal statute, the Courts have analyzed the claims in the same fashion. See Vitone v. Metro. Life Ins. Co., 943 F. Supp. 192, 200 (D.R.I. 1996) (citing Martin v. Fleet Nat'l Bank, 676 F. Supp. 423, 432 (D.R.I.1987)) (stating that Rhode Island statute "presents the same requirements as does its federal counterpart, and requires a similar analysis"); Cortellesso v. Cortellesso, C.A. No. P.C. 95-4571, 1997 WL 839911, *4-5 (R.I. Super. Apr. 29, 1997) (noting parallels between Federal and Rhode Island RICO subsections).

2011). In the present case, as in the George case, there is no allegation of an injury that is distinct from an injury caused by the predicate acts themselves. "The absence of such an injury is fatal to the section 1962(a) claim." Id. (citation omitted).

Similarly, 18 U.S.C. § 1962(b) makes it "unlawful for any person through a pattern of racketeering activity...to acquire or maintain...any interest in or control of any [RICO] enterprise." 18 U.S.C. § 1962(b). Like subsection (a), a plaintiff seeking to assert a claim under subsection (b) is required to plead a separate "'acquisition injury' analogous to the 'use or investment injury' required by § 1962(a)." Birch St. Recovery Corp. v. Thomas, CV-99-571-B, 2000 WL 1513799 (D.N.H. July 29, 2000) (quotation omitted). "It is not enough for plaintiffs to claim that they were injured as a result of the defendants' predicate acts of racketeering." Id. Any potential claim under subsection (b) fails because Plaintiffs' Second Amended Complaint is bereft of any allegation of a "distinct injury that stemmed from the...defendants' acquisition or maintenance of an interest in or control of any RICO enterprise." Id. This is fatal to a potential claim based on a violation of § 1962(b). Plaintiffs simply have not pled any cognizable claims under either subsection (a) or (b) of the Federal RICO statute (nor the corresponding sections of the RI RICO statute), and I therefore recommend that the District Court GRANT Defendant's Motion to the extent it relates to those claims.

### 2. Whether Plaintiffs Have Adequately Pled an "Enterprise"

Although the parties did not address subsections (a) and (b) in their Memoranda or at the hearing, both sides devoted significant time to Plaintiffs' claims asserted under subsection (c). In order to prevail on their RICO claims, Plaintiffs must prove four elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." In re Lupron Mktg. & Sales Practices Litig., 295 F. Supp. 2d 148, 163-164 (D. Mass. 2003) (citing Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985)). The first issue is whether Plaintiffs have adequately pled an "enterprise" as that term is defined in RICO jurisprudence. Paragraphs 97 through 100 of Plaintiffs' Second Amended Class Action Complaint allege several different alternate theories of an enterprise, each "upon information and belief." First, Plaintiffs assert that "SMM is an enterprise with

its officers, directors and/or employees of SMM and others unknown, conducting the affairs of the enterprise in violation of the statute by acting in concert to target and defraud Plaintiffs for their own financial benefit." (Document No. 29 at ¶ 97). Next, Plaintiffs assert that "the 'association-in-fact' enterprise consists of SMM and/or its officers, directors and/or employees and a third party and/or its officers, directors or employees, which sells scrap to SMM, conducting the affairs of the enterprise in violation of the statute by acting in concert to target and defraud Plaintiffs for their own financial benefit." Id. at ¶ 98. Plaintiffs alternatively plead that "the 'association-in-fact' enterprise consists of SMM and/or its officers, directors and/or employees and a third party and/or its officers, directors or employees, which is not engaged in business but rather created for the sole purpose of concealing the funds resulting from the enterprise's fraudulent actions, by acting in concert to target and defraud Plaintiffs for their own financial benefit." Id. at ¶ 99. Finally, Plaintiffs assert that "the 'association-in-fact ' enterprise consists of SMM and/or its officers, directors and/or employees and the computer systems and programs of SAI which company controls the weighing software and assists SMM and/or certain unknown SMM employees in violation of the statute by acting in concert to target and defraud Plaintiffs, conceal the actual weights of Plaintiffs' loads, by making adjustments or deductions to the weights and/or reallocating, falsely identifying or rejecting the types of the materials within the loads for their own financial benefit." Id. at ¶ 100.

Under RICO, "[a]n enterprise may be a legal entity like a business, a governmental unit, or a union, or it may be an informal grouping of individuals associated in fact." In re Lupron Mktg., 295 F. Supp. 2d at 163-164. "[However],...[t]he enterprise itself, however corrupt or corrupted, cannot itself be a RICO defendant. 'The person or persons alleged to be engaged in racketeering activity must be entities distinct from the enterprise.'" Id. (citing Odishelidze v. Aetna Life & Cas. Co., 853 F.2d 21, 23 (1st Cir.1988) (per curiam)) (a business and its employees could not do double duty as the enterprise and as the RICO persons). The inverse is also true. See Doyle v. Hasbro, Inc., 103 F.3d 186, 191 (1st Cir.1996) ("The...failure to identify any enterprise, distinct from a named person defendant, is fatal under RICO.").

Plaintiffs argue they have "sufficiently pled the requirements...[by stating]...four alternative theories [of an enterprise] in their Complaint." (Document No. 65-1 at p. 36). However, Plaintiffs note that, "[i]f necessary, the wording can easily be changed..." and that the "business relationship(s) between SMM and the other individuals or entities...are not fully known as Defendant has not yet produced discovery." Id. at p. 37-38. Plaintiffs also argues that, "[a]t the very least Plaintiffs are entitled to a 'second determination' as they have requested leave to conduct discovery, they have proposed amendments to their Complaint, and they have asserted critical information remains solely in the possession of defendant." Id. at p. 48. At oral argument, Plaintiffs' counsel noted that he recently obtained information he "could use to plead some of the racketeering allegations more specifically..." and he "would amend [Plaintiffs'] complaint." (Document No. 80 at p. 28).

When pressed by the Court to identify the enterprise, Plaintiffs' counsel noted, "that would be one thing that we would address in the pleading requirements. Here we have alleged a couple of different alternative versions of an enterprise...[w]e have alleged that there may be other companies out there which are, as yet, unidentified, which may be involved in the enterprise...." Id. at p. 30-31. Plaintiffs' counsel also suggested that "another possible scenario is that SMM itself is the enterprise and various of its employees are the RICO persons." (Document No. 80 at p. 32). "That would be a potential new count." (Document No. 80 at p. 34). Although Plaintiffs maintain that they properly and adequately pled a RICO claim, they also argue that if the Court disagrees, that they be given leave to amend their Complaint after further discovery has taken place.

While Plaintiffs have suggested that they may seek leave to amend their Complaint again, that issue is not presently before the Court. The sole issue before the Court is whether the Second Amended Complaint, on its face, states a claim under either RI RICO or the Federal RICO statute. The Court will consider each of Plaintiffs' alternate enterprise theories in turn. The first form of an enterprise pled by Plaintiffs is SMM as the enterprise, with its officers, directors and/or employees of SMM and others unknown, conducting the affairs of the enterprise. (Document No. 29 at ¶ 97). This incarnation of an

enterprise simply does not work. This proposed enterprise includes SMM (a corporation) as the RICO "person," as well as the enterprise. The Second Circuit has squarely addressed this scenario and found that it does not state a claim under RICO. See Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A., 30 F.3d 339, 344 (2nd Cir. 1994) ("...a corporate entity may not be both the RICO person and the RICO enterprise under section 1962(c)). The parties disagree as to whether this holding was overruled by Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 163-165 (2001). A close reading of that case indicates that the premise relied upon by SMM from the Riverwoods case is still good law. In fact, the Kushner Court noted that Riverwoods, "involved quite different circumstances which are not presented here. This case concerns a claim that a corporate employee is the 'person' and the corporation is the 'enterprise.'" This Court follows Riverwoods, and concludes that the allegations set out in paragraph 97 do not sufficiently state an enterprise under existing law.

Next, the Court must consider whether the Plaintiffs' three alternate allegations as to "association-in-fact" enterprises are sufficient to push these allegations past Defendant's Rule 12(c) challenge. Each association-in-fact enterprise includes SMM as the RICO person and SMM plus "others" as the RICO enterprise. The second alternate enterprise pled by Plaintiffs asserts that SMM "and a third party and/or its officers, directors or employees, which sells scrap to SMM" comprise the enterprise. (Document No. 29 at ¶ 98). The third alternate enterprise pled by Plaintiffs asserts that SMM and "a third party and/or its officers, directors or employees which is not engaged in business but rather created for the sole purpose of concealing the funds resulting from the enterprise's fraudulent actions..." comprise the enterprise. (Document No. 29 at ¶ 99). Finally, the fourth incarnation of an association-in-fact enterprise proposed by Plaintiffs is that SMM and " the computer systems and programs of SAI which company controls the weighing software and assists SMM and/or certain unknown SMM employees..." comprise the enterprise. Id. at ¶ 100. Essentially, with each alternate pleading, Plaintiffs assert that SMM is the RICO defendant and that the enterprise includes (a) an unnamed scrap metal company; (b) an unnamed, unidentified straw company; or (c) the computer systems and software at SAI.

In their Objection to the Motion, Plaintiffs concede that "[i]t is yet to be determined whether SMM and SAI and/or its employees constitute an enterprise." (Document No. 65-1 at p. 43). The Court cannot conceive of how computers can be a part of an enterprise, and Plaintiffs have offered no persuasive authority supporting that proposition. Thus, the Court declines to consider the allegation that SAI's "computer systems and programs" form part of an enterprise with SMM. Therefore, the only remaining potential avenues through which Plaintiffs attempt to allege an "association-in-fact" enterprise are their barebones allegations that SMM and an unnamed, unknown scrap metal company form the enterprise and/or SMM and an unknown, unnamed straw company form the enterprise. Plaintiffs have set forth no detail as to either alleged enterprise, and in fact, concede that they need discovery in order to flesh out whether such an enterprise even exists. (Document No. 80 at pp. 34, 36). Although the Supreme Court reiterated in 2009 that the term enterprise is to be broadly construed and that an association-in-fact enterprise "need not have a hierarchical structure or a 'chain of command,'" Boyle v. United States, 556 U.S. 938, 948 (2009), the somewhat broad definition of an enterprise does not excuse Plaintiffs from their basic pleading requirements. In the present case, Plaintiffs' threadbare Second Amended Complaint contains several unsupported, conclusory allegations of potential enterprises, along with a basic "parroting" of the RICO statutes. This simply does not withstand the scrutiny applied in a Rule 12(c) review. Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011) (a claim consisting of little more than "allegations that merely parrot the elements of the cause of action" may be dismissed). See also Bill Buck Chevrolet, Inc. v. GTE Florida, Inc., 54 F. Supp. 2d 1127, 1135 (M.D. Fla. 1999) ("The presence of an enterprise is an essential element of a RICO complaint; merely identifying the type of business in which the members of the alleged enterprise engage is not enough either to allow the Court to evaluate whether the alleged enterprise constitutes an enterprise within the meaning of RICO, or to provide Defendant fair notice of the claim against which it must defend.")

3. **The Predicate Act of Mail Fraud**

In addition to failing to adequately plead an enterprise under RICO, Plaintiffs' allegations with respect to the predicate act of mail fraud fail for a few reasons. Plaintiffs' Second Amended Complaint states,

"SMM's practice of mailing payments to the Plaintiffs for the loads reflecting the fraudulent adjustments, deductions, manual weights and/or re-allocation, false identification or rejection of the materials within the loads constitutes mail fraud." (Document No. 29 at ¶ 106). Plaintiffs also note that they "[r]eviewed the books and records...and discovered a discrepancy between the amount of scrap metal it had purchased from its customers and the amount it had sold to SMM according to SMM's payments...." (Document No. 29 at ¶ 38).

To prove mail fraud, plaintiffs must provide evidence of "(1) a scheme to defraud based on false pretenses, representations, or promises; (2) the defendant's knowing and willing participation in the scheme with the specific intent to defraud; and (3) the use of interstate mail communications in furtherance of the scheme." Cavallaro v. UMass Mem'l Health Care Inc., C.A. No. 09-40152-FDS, 2010 WL 3609535 (D. Mass. July 2, 2010). Mail fraud must be plead with particularity under Fed. R. Civ. P. 9(b). Feinstein v. Resolution Trust Corp., 942 F.2d 34, 42–43 (1st Cir.1991).

In the present case, Plaintiffs' allegations fail for two reasons. First, Plaintiffs have failed to satisfy the element requiring "use of the interstate mail communications in furtherance of the scheme." In considering that issue, the District of Massachusetts has noted that, "the success of the scheme must be dependent in some way on the mailings, either in obtaining the desired object or in avoiding or delaying detection of the scheme." Cavallaro, 2010 WL 3609535 at *3 (quoting United States v. Greenleaf, 692 F.2d 182, 186 (1st Cir.1982)); see United States v. Pacheco-Ortiz, 889 F.2d 301, 305 (1st Cir.1989) ("the scheme's completion or the prevention of its detection must have depended in some way on the mailings."). In the Cavallaro case, as here, the mailings in question "did not further defendants' fraudulent scheme; to the contrary, they made the scheme's discovery more likely." See United States v. Maze, 414 U.S. 395, 403 (1974) (concluding that mailings did not further a fraudulent scheme when they "increased the probability that [the defendant] would be detected and apprehended").

Second, the predicate act of mail fraud was not pled with particularity, another fatal blow to a potential RICO claim. "It is settled law in this circuit that Fed. R. Civ. P. 9(b), which requires a party to plead

fraud with particularity, extends to pleading predicate acts of mail and wire fraud under RICO. As in any other fraud case, the pleader is required to go beyond a showing of fraud and state the time, place and content of the alleged mail and wire communications perpetrating that fraud." Tomaselli v. Beaulieu, C.A. No. 08-CV-10666-PBS, 2010 WL 2105347 (D. Mass. May 7, 2010), see also White v. Union Leader Corp., No. Civ. 00-122-B, 2001 WL 821527 (D.N.H. July 13, 2001) ("a plaintiff must 'state the time, place and content of the alleged mail...communications perpetrating that fraud.'") As noted by Defendant, "Plaintiffs do not allege the time and place of these allegedly fraudulent mailings...[nor] what statements were made, when and by whom they were made, the content of such statements, and the manner in which they were misleading...." (Document No. 59-1 at p. 11). Under established case law, these shortcomings are fatal to Plaintiffs' RICO claims. In sum, for all the reasons stated, the Court recommends that the District Court dismiss Counts IX and X of Plaintiffs' Second Amended Complaint for failure to state a claim.

**Conclusion**

Based on the foregoing, I recommend that Defendant's Motion for Partial Judgment on the Pleadings (Document No. 59) be GRANTED as to Counts I, VIII, IX and X, and DENIED as to Count II.

Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of the Court within fourteen (14) days of its receipt. See Fed. R. Civ. P. 72(b); LR Cv 72. Failure to file specific objections in a timely manner constitutes waiver of the right to review by the District Court and the right to appeal the District Court's decision. See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

/s/   Lincoln D. Almond
LINCOLN D. ALMOND
United States Magistrate Judge
August 13, 2014